PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.  15-3094, 15-3095, 15-3096 & 15-3097
_____

In re:  SEMCRUDE L.P., et al.,
Debtors

ARROW OIL & GAS, INC., et al

v.

J. ARON & COMPANY, et al


ANSTINE & MUSGROVE, INC;
ARROW OIL & GAS INC;
BEASLEY OIL COMPANY;
BLAKE EXPLORATION LLC;
BRADEN-DEEM INC;
CALVIN NOAH, d/b/a Calvin Noah Oil Company;
CMX INC; CASEY MUSGROVE OIL CO, INC;
CENTRAL OPERATING INC;
CLARK EXPLORATION COMPANY;
CORAL COAST PETROLEUM INC;
CRAWLEY PETROLEUM CORP; DC ENERGY INC;
D.E. EXPLORATION INC;
DAVIS PETROLEUM INC;
DAYSTAR PETROLEUM INC; DK OPERATING INC;

DOUBLE EAGLE EXPLORATION INC;
DRILLERS AND PRODUCERS INC;
DUNCAN OIL PROPERTIES INC;
FAIRFIELD OIL & GAS CORP;
THE GLOCO LLC; GMX RESOURCES INC;
GRA EX, LLC;
GREAT PLAINS ENERGY, INC;
GROUND DEVELOPMENT CO; HERMAN L LOEB, LLC;
H.I. INC; J&D INVESTMENTS, LLC;
JACK EXPLORATION, INC;
KAHAN & ASSOCIATES INC;
KEITH F. WALKER OIL & GAS CO., LLC;
KINGERY DRILLING CO;
KLM EXPLORATION COMPANY INC;
LANCE RUFFEL OIL & GAS CORPORATION;
LANDMARK RESOURCES INC; LARIO OIL & GAS CO;
L&J OIL PROPERTIES, INC;
LD DRILLING, INC; LITTLE BEAR RESOURCES, INC;
MCCOY PETROLEUM CORPORATION;
MCGINESS OIL COMPANY OF KANSAS;
MESA EXPLORATION COMPANY, INC;
MID-CONTINENT ENERGY CORPORATION;
MOLITOR OIL, INC;
MULL DRILLING COMPANY, INC;
MURFIN DRILLING COMPANY, INC;
MUSGROVE ENERGY INC; MUSTANG FUEL CORP;
NYTEX ENERGY LLC;
OIL COMPANY OF AMERICA INC;
OKLAHOMA OIL & GAS MANAGEMENT INC;
PICKRELL DRILLING COMPANY, INC;
PROLIFIC RESOURCES, LLC;
RAMA OPERATING COMPANY, INC; RANDON
PRODUCTION COMPANY INC;

RED OAK ENERGY INC; RITCHIE EXPLORATION INC;
RJ SPERRY CO; ROSS HOENER, INC; SEEKER, LLC;
SHORT & SHORT, LLC; SNYDER PARTNERS;
STEPHENS & JOHNSON OPERATING CO;
TEMPEST ENERGY RESOURCES LP;
TEX-OK ENERGY LIMITED PARTNERSHIP; TGT
PETROLEUM CORPORATION;
THREE-D RESOURCES, INC;
THOROUGHBRED ASSOCIATES, LLC;
TRIPLEDEE DRILLING CO., LLC;
TRIPOWER RESOURCES, LLC;
VIKING RESOURCES, INC;
V.J.I. NATURAL RESOURCES INC;
VEENKER RESOURCES, INC;
VESS OIL CORPORATION;
VINCENT OIL CORPORATION;
W.D. SHORT OIL COMPANY, LLC;
WELLCO ENERGY, INC;
WELLSTAR CORPORATION;
WHITE EXPLORATION INC;
WHITE PINE PETROLEUM CORPORATION,
                                        Appellants

_____

No.  15-3121

_____

In re:  SEMCRUDE L.P., et al.,
        Debtors

BP OIL SUPPLY COMPANY

v.

SEMGROUP, L.P., et al

Star Production, Inc; LSC Production Company,
Appellants

_____

No. 15-3123

_____

In re: SEMCRUDE L.P., et al.,
Debtors

J. ARON & COMPANY

v.

SEMGROUP, L.P., et al

IC-Co, Inc.,
Appellant

4

_____

No. 15-3124

_____


In re: SEMCRUDE L.P., et al.,
Debtors

IC-CO, INC; WEOC, INC.;
RESERVE MANAGEMENT INC

v.

J. ARON & COMPANY


IC-CO, Inc.,

Appellant

_____

Appeal from the United States District Court
for the District of Delaware
(D. Del. Nos. 1-14-cv-00038, 1-14-cv-00039, 1-14-cv-00040,
1-14-cv-00041, 1-14-cv-00357 & 1-14-cv-00358)
District Judge: Honorable Sue L. Robinson

_____

Argued April 4, 2017

Before: AMBRO, JORDAN, and FISHER, <u>Circuit Judges</u>

(Opinion filed: July 19, 2017)

Blake H. Bailey
Paul D. Moak
Basil A. Umari
McKool Smith
600 Travis Street, Suite 7000
Houston, TX   77002

Peter S. Goodman
Sarah O. Jorgensen
Michael R. Carney
Hugh M. Ray
McKool Smith
One Bryant Park, 47th Floor
New York, NY   10036

Lewis T. LeClair                [Argued]
McKool Smith
300 Crescent Court, Suite 1500
Dallas, TX   75201

Adam G. Landis
Matthew B. McGuire
Landis Rath & Cobb
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE   19899

   *Counsel for Anstine & Musgrove Inc., et. al.*
   *(The Associated Producers)*

Don A. Beskrone
Stacy L. Newman
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150, 8th Floor
Wilmington, DE  19899

Boaz S. Morag
Rishi Zutshi
Thomas J. Moloney          [Argued]
Cleary Gottlieb Steen & Hamilton
One Liberty Plaza
New York, NY   10006

     *Counsel for J. Aron & Co.*

James S. Carr
Melissa E. Byroade
David Zalman               [Argued]
Monica Hanna
Kelley Drye & Warren
101 Park Avenue
New York, NY   10178

Kevin M Capuzzi
Jennifer R. Hoover
Benesch Friedlander Coplan & Arnoff
222 Delaware Avenue, Suite 801
Wilmington, DE   19801

     *Counsel for BP Oil Supply Co.*

Ian C. Bifferato
Thomas F. Discoll, III
Bifferato
800 North King Street, Plaza Level
Wilmington, DE  19801

Kevin G. Collins
Barnes & Thornburg
1000 North West Street, Suite 1500
Wilmington, DE  19801

Mark D. Collins
John H. Knight
Michael Romanczuk
Zachary I. Shapiro
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE  19801

L. Katherine Good
Whiteford Taylor & Preston
405 North King Street
The Renaissance Center, Suite 500
Wilmington, DE  19801

Maris J. Kandestin
DLA Piper
1201 North Market Street
Suite 2100
Wilmington, DE   19801

Garvan F. McDaniel
Hogan McDaniel
1311 Delaware Avenue
Wilmington, DE 19806

R. Stephen McNeill
Potter Anderson & Corroon
1313 North Market Street, 6th Floor
Wilmington, DE 19801

Travis A. McRoberts
Akin Gup Strauss Hauer & Feld
1700 Pacific Avenu8e
4100 First City Center
Dallas, TX 75201

Benjamin L. Stewart
Bailey Brauer
8350 North Central Expressway
Suite 935, Campbell Centre I
Dallas, TX 75206

Mark Stromberg
Stromberg Stock
8750 North Central Expressway, Suite 625
Dallas, TX 75231

W. Robert Wilson
510 Kihekah Avenue
Pawhuska, OK 74056

   *Counsel for Semcrude LP*

Charles J. Brown, III
Shannon Dougherty Humiston
Gellert Scali Busenkell & Brown
913 North Market Street, 10th Floor
Wilmington, DE  19801

*Counsel for Star Production Inc., LCS Production Co.*

Hartley B. Martyn          [Argued]
Martyn & Associates
820 Superior Avenue, N.W., 10th Floor
Cleveland, OH   44113

Duane D. Werb
Werb & Sullivan
300 Delaware Avenue
13th Floor, P.O. Box 25046
Wilmington, DE  19899

*Counsel for IC Co. Inc.*

———————

OPINION OF THE COURT
———————

AMBRO, <u>Circuit Judge</u>

Appellants, who are oil producers, sold their product to SemGroup L.P. and affiliates (including SemCrude L.P.), midstream oil and gas service providers and the Debtors in the underlying Chapter 11 cases.  SemGroup sold oil to and traded oil futures with Appellees, downstream oil purchasers.  The producers took no actions to protect themselves in case

10

of SemGroup's insolvency. The downstream purchasers did; in the case of default, they could set off the amount they owed SemGroup for oil by the amount SemGroup would owe them for the value of the outstanding futures trades. Accordingly, when SemGroup filed for bankruptcy, the downstream purchasers were paid in full while the oil producers were paid only in part.

Because the oil producers did not take precautionary measures to ensure payment in case of SemGroup's insolvency, all they have to rely on are local laws they contend give them automatically perfected security interests or trust rights in the oil that ended up in the hands of the downstream purchasers. But the parties who took precautions against insolvency do not act as insurers to those who took none. Accordingly, we affirm the grant of summary judgment in the downstream purchasers' favor.

## I.  BACKGROUND

### SemGroup's Two Businesses

SemGroup L.P. and its subsidiaries (jointly and severally referred to as "SemGroup") provided "midstream" oil services. It purchased oil from producers and resold it to downstream purchasers. It also traded financial options contracts for the right to buy or sell oil at a fixed price on a future date. At the end of the fiscal year preceding bankruptcy, SemGroup's revenues were $13.2 billion.

Two of SemGroup's operating companies, SemCrude, L.P. and Eaglwing, L.P., purchased oil from thousands of wells in several states and from thousands of oil producers, including from Appellants, producers located in Texas, Kansas, and Oklahoma. The producers act on behalf of many parties who have interests in the oil at the wellhead. These

11

interest owners include the person or entity who owns the land in fee simple, and thus owns the rights to the minerals. That person or entity transfers the mineral rights to an oil company through a lease. The company holds the "working interest"—the right to drill and sell the oil from the leased land. The working-interest owners appoint an operator to work the well. Most of the producers in this appeal are owners of working interests or operators.

After purchase, SemGroup moved the oil via trucks and pipelines and stored it in major aggregation centers in Oklahoma, Kansas, and elsewhere. Per industry custom, SemGroup purchased the oil on credit, paying for it on the 20th day of the month following the sale. For example, oil purchased in January would be paid for on February 20.

SemGroup always paid the producers for the oil in full until the bankruptcy filing. It then resold the product to downstream purchasers, including to Appellees, J. Aron & Company and BP Oil Supply Co., both large oil distributors. SemGroup expressly warranted to the downstream purchasers that it sold them oil "free from all royalties, liens, and encumbrances." *See, e.g.,* Conoco General Provisions § B, J.A. 2505. Again, per industry custom the downstream purchasers bought the oil on credit, with payment due the 20th of the following month. J. Aron and BP had no communication with the thousands of oil producers from whom SemGroup purchased the oil and only knew of the existence of some of the larger producers. J. Aron and BP dispute whether they even purchased any of Appellants' oil and contend that Appellants cannot trace the oil they sold, as it was mixed with millions of barrels of oil from innumerable other producers.

Until the bankruptcy filing, J. Aron and BP paid in full for the oil they bought. BP also sold oil to SemGroup, so

12

when payment was due they would net out their obligations—*i.e.*, if BP bought $10 million from SemGroup and SemGroup bought $8 million from BP, then BP would just pay $2 million to SemGroup.

In addition to midstream oil services, SemGroup also traded oil futures with J. Aron and BP. This trading strategy lead to SemGroup's insolvency. Essentially SemGroup bet that the price of oil would drop, while J. Aron and BP wanted to secure a low price of oil in the event that prices would rise. SemGroup would win the bet if the oil price dropped while J. Aron and BP would win if the price rose. The (simplified) mechanics are as follows.

SemGroup sold what are known as call options. In exchange for an upfront premium, the purchaser of the call option received the right to purchase oil at a specified price and date. To illustrate, if in December J. Aron purchased the right to buy 10,000 barrels of oil at $50 a barrel on March 1, but the market price that date was $45 a barrel, that option was worthless because J. Aron could buy oil at a cheaper price on the market; the $50 buying right did not save J. Aron money. SemGroup therefore would make money: it received the upfront premium J. Aron paid for the option, but did not end up losing the bet because it would not have to sell oil at less than market price. Conversely, if the market price on March 1 was $55 a barrel, J. Aron would be "in the money"—SemGroup would have to sell J. Aron 10,000 barrels of oil at $50 a barrel, $5 below the market rate. SemGroup thus would lose $50,000 dollars on the option because, if J. Aron did not have the buying right, SemGroup could have sold that oil on the market for the going price of $55. These options did not "physically settle." That is, SemGroup would not actually sell these oil barrels; it would just owe J. Aron $50,000.

13

SemGroup's gambling strategy was in stark contrast with hedging oil prices. To hedge a drop in the price of oil, SemGroup could have acquired put options—the right to *sell* oil at a specified price. This would protect them against price drops while still allowing them to take advantage of selling at high oil prices.

As it turns out, SemGroup was a bad gambler. Oil prices rose throughout 2007 and 2008. Its CEO believed that eventually oil prices would drop. So each time SemGroup lost money on these options, rather than realize the financial loss, it would sell more options to cover the loss. This is referred to as "rolling" in the industry, and is essentially doubling down on a lost bet. For example, if SemGroup lost $1 million on the March 1 trade, it would resell new options and collect $1 million in new premiums, thus betting that the price of oil would drop on a date in the future. SemGroup thought that, if it kept "rolling" these options, eventually the price of oil would drop and all the options would be worthless. If that happened, SemGroup would have acquired all of these upfront premium payments at no cost. This doubling-down strategy had a downside, however. Rolling options greatly increased SemGroup's exposure to future losses. By July 2008 it was exposed to a potential $2.8 billion loss if the option bets did not pay off.

### *Liquidity Problems, Setoff Rights, and the Bankruptcy Filing*

SemGroup had to pledge cash collateral to margin accounts to cover its exposure on the options. The cash in these margin accounts assured the trading counterparties that SemGroup could pay for any loss on the options. The margin exposure was calculated by the "mark to market" method—the amount SemGroup would owe the counterparty if the option liquidated that day. As SemGroup's exposure on these

14

options increased, so did its margin requirements. Eventually it ran out of funds to meet those margin obligations, causing its bankruptcy.

Before the bankruptcy, J. Aron and BP started buying oil from, and trading options with, SemGroup. In November 2007, J. Aron entered into a master agreement governing its relationship with SemGroup, and in April 2008 BP entered into a similar arrangement. Under the agreements, in the event of SemGroup's default J. Aron and BP could set off any outstanding amount due for oil purchases with the amount owed on options trades. Until SemGroup's default, J. Aron and BP always paid in full for their oil purchases and never exercised a setoff right.

Through the late spring and early summer 2008, oil prices kept rising and SemGroup continued losing on its trades. It failed to receive additional financing to meet its ever-increasing margin obligations. On July 17, 2008, as set out in their agreement, J. Aron asked SemGroup for adequate assurance of performance and that SemGroup meet certain credit-support thresholds. When SemGroup did not respond, J. Aron called a default. The parties thus set off the outstanding amounts due. J. Aron owed to SemGroup $435 million in oil purchases, and SemGroup owed to J. Aron $345 million in outstanding options trades. Accordingly, J. Aron owed $90 million, the net amount after the oil and options were set off.

On July 22, 2008, soon after J. Aron called the default, SemGroup filed for bankruptcy. This triggered a default as to BP, so it also set off the prepetition amount it owed

15

SemGroup for oil less the amount SemGroup owed it for the options trades. Consequently, BP owed $10 million.[1]

### *Bankruptcy Proceedings*

Following its Chapter 11 filing, more than a thousand oil producers were unpaid. Oil producers, purchasers, and SemGroup's lending banks inundated the Bankruptcy Court with adversary proceedings and motions to distribute SemGroup's assets. The Court established omnibus procedures to determine the producers' rights and priorities versus the banks, with a single adversary proceeding for each state where the producers sold product. The relative priority of the producers and downstream purchasers was preserved for later rulings.

In those rulings, the Bankruptcy Court first held that the lending banks' security interests in SemGroup's assets took priority over any purported lien or trust rights granted under state law. It certified appeals directly to our Court as matters of first impression, 28 U.S.C. § 158(d)(2), but the producers and lending banks settled while the appeals were pending. By stipulation, the producers reserved their right to pursue their claims against the downstream purchasers and to appeal these rulings in the future.

Meanwhile, J. Aron and BP filed separate adversary proceedings where they sought to tender the amount they owed to the bankruptcy estate in exchange for a release from all liability. The producers also filed nearly 30 separate lawsuits against J. Aron and BP in state and federal courts. These suits were transferred to the Bankruptcy Court for

---

[1] There is no contention before us that the Bankruptcy Code prohibited these setoffs. *See generally* 11 U.S.C. §§ 362(b) and 553.

16

resolution. In September 2009, it confirmed the reorganization plan by which J. Aron and BP's tendered funds were turned over to the producers for full payment of oil delivered between July 2 and July 21, 2008.[2] The tendered funds also paid off 12.9% of the amount owed for oil sold from June 1 to July 1, 2008.

After a discovery process involving more than 100 parties, over 150 depositions, and millions of pages of documents, J. Aron and BP moved for summary judgment against the Appellant-Producers (hereafter, the "Producers"). The Bankruptcy Court filed proposed findings of facts and conclusions of law recommending summary judgment in favor of J. Aron and BP. It concluded in exceptional depth and easily understood language that there was no evidence of fraud and that J. Aron and BP purchased the oil from SemGroup free of any purported security interest either as (1) buyers for value, or (2) as buyers in the ordinary course. *In re SemCrude, L.P.*, 504 B.R. 39, 44 (Bankr. D. Del. 2013). The District Court overruled the Producers' objections to the Bankruptcy Court's recommendation and adopted it. *In re Semcrude, L.P.*, No. 14-CV-41 (SLR), 2015 WL 4594516 (D. Del. July 30, 2015).

### *Summary of Claims on Appeal*

The Producers' claims do not rely on bankruptcy law. They are based on state statutes and common law fraud. The

---

[2] This followed from 11 U.S.C. § 503(b)(9), whereby an allowable administrative expense includes "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

17

Texas and Kansas Producers argue that, under their states' nonuniform amendments to the Uniform Commercial Code, they had perfected security interests in the oil they sold to SemGroup and J. Aron and BP took the oil subject to these interests. The Oklahoma Producers bring separate claims derived from an Oklahoma statute they contend imposes an implied trust for their benefit. They also claim to have an equitable interest in the oil proceeds J. Aron and BP took to set off the options debt.

## II. JURISDICTION

We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's grant of summary judgment. Yet the Producers argue that the District Court lacked subject matter jurisdiction even though the confirmed Chapter 11 plan expressly provided for jurisdiction over this controversy.

The Bankruptcy Court determined that the proceeding before it was non-core,[3] but both it and the District Court exercised jurisdiction because that proceeding was "related to" SemGroup's bankruptcy case. *See* 28 U.S.C. § 157(c)(1)("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11."); 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings . . . related to cases under title 11.").

The Bankruptcy and District Courts correctly determined that "related-to" bankruptcy jurisdiction exists here. That is so where the adversary proceeding has any "conceivabl[e]" effect on the bankruptcy estate. *Nuveen*

---

[3] In contrast to non-core, a core bankruptcy proceeding includes, among other things, estate administration, claims, plans, and debt discharges. 28 U.S.C. § 157(b)(2).

*Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir. 2012) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984)). All we ask is whether the "outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.* at 294 (quoting *Pacor*, 743 F.2d at 994).

Related-to jurisdiction—like other types of federal jurisdiction—is determined at the time of filing. *Id.* (citing *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570–71 (2004)). The Producers thus miss the mark by arguing that, because the plan has now been confirmed, the bankruptcy estates can no longer be affected. *See id.* ("[C]onfirmation of a bankruptcy plan does not divest a district court of related-to jurisdiction over pre-confirmation claims.") (citations omitted).

At the time of filing of these adversary actions and related Producers' suits, which was prior to plan confirmation, the Producers' claims unquestionably could have affected the bankruptcy estates. Resolving these claims sets the competing rights among creditors to the estates' funds. Moreover, if the Bankruptcy Court had disallowed the setoff process (whereby J. Aron and BP set off the amount owed for the oil less what was owed on the options contracts), they might have had to return money to SemGroup's estate. Accordingly, the Bankruptcy and District Courts possessed related-to jurisdiction, and we have jurisdiction to hear this appeal.

## III.    STANDARD OF REVIEW

We exercise plenary review over a grant of summary judgment. *Rosen v. Bezner*, 996 F.2d 1527, 1530 (3d Cir.

19

1993). It is proper when, viewing the evidence in the light most favorable to the opposing party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56.

## IV. ANALYSIS

As noted, the Texas and Kansas Producers rely on their states' nonuniform amendments to the Uniform Commercial Code, which they argue give them automatically perfected security interests in the oil they sold to SemGroup that J. Aron and BP ultimately received. We first conclude that the Producers do not have a perfected security interest even if Texas or Kansas law applied. Accordingly, J. Aron and BP purchased the oil from SemGroup free of any lien as buyers for value. U.C.C. § 9-317(b).

Next, we turn to these Producers' fraud claim and agree with the Bankruptcy and District Courts that there is no evidence of fraud. J. Aron and BP took precautions to protect themselves in case SemGroup became insolvent, but they did not defraud SemGroup's other creditors.

To conclude, we address the Oklahoma Producers' claims based on an Oklahoma statute they contend imposes a trust relationship between them and anyone who purchases their oil. That interpretation lacks logic and is not supported by the statute's text.

### A. *The U.C.C. Claim*

Because we must parse uniform and state-specific versions of U.C.C. Article 9 (the Article on security interests), it is helpful to explain briefly a few fundamental concepts. A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation."

20

U.C.C. § 1-201(b)(35). In other words, it is a lien on a piece of property that secures payment of a debt. If the debt is not paid, the person who holds the security interest can repossess that property—*i.e.*, take it in satisfaction of the debt. The person who owns that security interest is called the "secured party." U.C.C. § 9-102(a)(73) ("'Secured party' means: (A) a person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding."). The property subject to the security interest is called "collateral." U.C.C. § 9-102(a)(12). And a "debtor" is the person with an ownership interest in that collateral. U.C.C. § 9-102(a)(28) ("'Debtor' means: (A) a person having an interest, *other than a security interest or other lien*, in the collateral, whether or not the person is an obligor. . . .") (emphasis added).

The Producers contend that they sold the oil to SemGroup on credit subject to a security interest—that is, they retained a lien in the oil as long as SemGroup had not paid them for that oil, and if SemGroup did not pay for the oil the Producers could hypothetically repossess it. The oil they sold here is the "collateral," and SemGroup, who purchased the oil, is the "debtor." The Producers further assert that their security interests continued in the oil even after SemGroup resold it to J. Aron and BP. *See* U.C.C. § 9-315(a)(1) ("a security interest or agricultural lien continues in collateral notwithstanding sale"). Thus, J. Aron and BP received the oil subject to the security interest, and, because SemGroup did not pay the Producers in full, the Producers had the right to reclaim the oil from J. Aron and BP. Accordingly, J. Aron and BP would have to return to the Producers the value of the oil used to set off options debt with SemGroup.

J. Aron and BP, however, contend that they took the oil as buyers for value and thus free of any security interest. *See* U.C.C. § 9-317(b) ("[A] buyer, other than a secured

21

party, of . . . goods . . . takes free of a security interest . . . if the buyer gives value and receives delivery of the collateral without knowledge of the security interest . . . and before it is perfected."). This defense is simple: if a security interest is not perfected,[4] a buyer takes the property free of that security interest unless the buyer actually knew of the security interest. As discussed below, we conclude that J. Aron and BP qualify as buyers for value. To do so, we address whether (1) the security interests were perfected, (2) J. Aron and BP actually bought the oil or acquired it as secured parties, and (3) they knew the Producers' security interests even existed.

### 1. Security interests were not perfected.

To perfect a security interest, in most instances a party must file a financing statement in the appropriate state office. *See* U.C.C. § 9-310(a) ("[A] financing statement must be filed to perfect all security interests."). Here, the Texas and Kansas Producers did not file a financing statement or take any other steps to perfect their security interests. Instead, they urge us to apply their states' versions of the U.C.C. because they contain nonuniform amendments that the Producers argue give oil producers an automatically perfected security interest in the oil they produced. *See* Tex. Bus. & Com. Code § 9.343 ("(a) This section provides a security

---

[4] The holder of a "perfected" security interest has much stronger recourse to enforce that interest against third parties than if the interest was not perfected. Generally perfection comes into play to determine priority over conflicting interests in collateral: perfected security interests have priority over unperfected security interests, and, as between conflicting security interests, the security interest perfected first has priority over interests perfected later. *See* U.C.C. § 9-322.

interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as debtor, to pay the purchase price. . . . (b) The security interest provided by this section is perfected automatically without the filing of a financing statement."); Kan. Stat. § 84-9-339a(a) (same); Kan. Stat § 84-9-339a(b) ("the security interest provided by this section is perfected as of the date of recording [the production of that oil]"). But the Producers miss that, even if we were to apply Texas or Kansas law,[5] we apply those states' versions of Article 9, not just their nonuniform amendments in isolation. *See* Tex. Bus. & Com. Code § 9.343(p) ("The rights of any person claiming under a security interest or lien created by this section are governed by the other provisions of [Article 9] except to the extent that this section necessarily displaces those provisions."); Kan. Stat. § 84-9-339a(o) (same).

Texas and Kansas, along with every other state, adopted a key feature of revised U.C.C. Article 9: its uniform choice-of-law provision. So even starting with Texas's or Kansas's U.C.C., we begin with this rule, which states that "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." U.C.C. § 9-301(1); *see* Tex. Bus. & Com. Code § 9.301(1) (same); Kan. Stat. § 84-9-301(1) (same); *see also*

---

[5] The Bankruptcy and District Courts applied Delaware's U.C.C. choice-of-law rules because that is the forum state. *See, e.g.*, *Robeson Indus. Corp. v. Hartford Accident & Indemn. Co.*, 178 F.3d 160, 164–65 (3d Cir. 1999) (applying choice of law of forum state in resolving adversary proceeding based on state-law claim). We need not reach this issue for the purposes of this appeal because, regardless of the state, each has the same choice-of-law rule, U.C.C. § 9-301.

23

U.C.C. § 9-301 cmt.4 ("[T]he law governing perfection of security interests in both tangible and intangible collateral, whether perfected by filing or automatically, is the law of the jurisdiction of the debtor's location, as determined under Section 9-307.").

Here, as noted above, SemGroup is the debtor because it purchased the oil on credit subject to the Producers' security interests. SemGroup and its affiliates are registered in Delaware or Oklahoma. U.C.C. § 9-307(e) ("A registered organization that is organized under the law of a State is located in that State."). Accordingly, the "local law of [Delaware or Oklahoma] governs perfection," not Texas or Kansas law. U.C.C. § 9-301(1). Oklahoma and Delaware require perfection by filing a financing statement. Okla. Stat. tit. 12A, § 1-9-310; Del. Code tit. 6, § 9-310. Because it is undisputed that the Producers never made such a filing, their interests are unperfected.

The only potential exception to § 9-301(1)'s debtor-location rule is for as-extracted collateral. *See* U.C.C. § 9-301(4) ("The local law of the jurisdiction in which the wellhead or minehead is located governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in as-extracted collateral."). The Producers' oil does not qualify for this exception because, for oil to be as-extracted collateral, a debtor must have a preexisting interest in the oil *before* it is extracted at the wellhead. *See* U.C.C. § 9-102(a)(6) ("'As-extracted collateral' means (A) oil, gas, or other minerals that are subject to a security interest that: (i) is created by *a debtor having an interest in the minerals before extraction*; and (ii) attaches to the minerals as extracted; or (B) accounts arising out of the sale at the wellhead or minehead of oil, gas, or other minerals in which *the debtor had an interest before extraction*.") (emphases added). Here, SemGroup had no interest in the oil while it

24

was in the ground. Only after the Producers extracted and sold it did SemGroup become involved.

The Producers nonetheless argue that these automatic perfection laws "necessarily displace" the choice-of-law rule. *See* Tex. Bus. & Com. Code § 9.343(p) ("The rights of any person claiming under a security interest or lien created by this section are governed by the other provisions of this chapter except to the extent that this section *necessarily displaces* those provisions.") (emphasis added); Kan. Stat. § 84-9-339a(o) (same). But nothing about these automatic perfection laws "necessarily displace[s]" the rest of Article 9. Rather, these local laws apply when the debtor is located in Texas or Kansas, or where the debtor is so closely involved at the wellhead that it has some preexisting interest in the oil before it is extracted from the ground so that the oil constitutes as-extracted collateral. U.C.C. §§ 9-301(1) & (4).

The Producers further rely on a provision referring to security interests *created by* the government. U.C.C. § 9-109(c)(3) ("This article does not apply to the extent that . . . a statute of another State, a foreign country, or a governmental unit of another State or a foreign country, other than a statute generally applicable to security interests, expressly governs creation, perfection, priority, or enforcement of a security interest *created by* the state, country, or governmental unit.") (emphasis added). An entity of Texas or Kansas government did not create the security interests. Instead, the security interests were created by SemGroup purchasing oil from the Producers.

The Producers also argue that Delaware or Oklahoma perfection laws incorporate the automatic-perfection oil lien laws. They rely on an Official Comment to a separate section of Article 9 (on buyer defenses) that generally mentions the existence of nonuniform amendments. *See* U.C.C. § 9-320

25

cmt.7 ("Several [states] have adopted special statutes and nonuniform amendments to Article 9 to provide special protections to mineral owners."). This Comment recognizes that certain states might adopt special provisions to protect mineral owners; it does not automatically incorporate unspecified local laws. Beyond that, a Comment to the U.C.C. does not supersede statutory text, and the Comment says nothing about overriding Article 9's choice-of-law rules.

All told, the Producers misunderstand the burdens and uncertainty their U.C.C. interpretation would create. SemGroup resold oil from thousands of producers located in eight different states. The downstream purchasers, including J. Aron and BP, had no dealings with this diverse group of producers, did not even know who these producers were, and were buying oil in bulk from storage centers, so they did not know which producers' oil they received. To determine possible conflicting security interests, instead of merely checking the filing records of the states of the entities they purchase from, downstream purchasers would have to discover the identities and locations of potentially thousands of producers with whom they have no contact.

Eliminating this type of uncertainty was of foundational importance to the U.C.C.'s simplified notice system. Prior to the 2001 revisions of the U.C.C., parties normally had to search for financing statements wherever a debtor had collateral to know if anything was encumbered. *See* U.C.C. § 9-103(b)(1) (*1995*) ("Except as otherwise provided in this subsection, perfection and the effect of perfection or non-perfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected."). Now the U.C.C. requires that a party check for filings in the debtor's location and understand that locale's

26

secured transactions laws. *See* U.C.C. § 9-101 cmt.4(c) ("This Article changes the choice-of-law rule governing perfection (*i.e.*, where to file) for most collateral to the law of the jurisdiction where the debtor is located."). If the oil producers want to encumber the oil they sell to an out-of-state first purchaser, all they need to do is comply with the rules uniformly applicable throughout the country to all sellers of goods—file a financing statement in the state where that first purchaser is located.

In conclusion, under U.C.C. § 9-301(1), Delaware and Oklahoma law govern perfection. Texas and Kansas's nonuniform amendments to Article 9 do not save the Producers. J. Aron and BP thus may qualify as buyers for value because the security interests the Producers may have claimed were not perfected. *See* U.C.C. § 9-317(b) (buyer-for-value defense only applies "before [the security interest] is perfected").

## 2. J. Aron and BP purchased the oil from SemGroup.

The second premise underlying the Producers' claims is that J. Aron and BP did not buy the oil from SemGroup. Instead, under the parties' setoff agreements, J. Aron and BP acquired oil as a secured party—they took it as collateral for the options trades—and thus did not give "value" for it. *See* U.C.C. § 9-317(b) ("A buyer, other than a secured party, of . . . goods . . . takes free of a security interest . . . if the buyer gives value . . . .").

The Producers mischaracterize J. Aron and BP's business relationships with SemGroup. J. Aron and BP did not acquire the oil because it was collateral for the options trades; they acquired it on credit per industry custom. These purchases on credit—promises to pay—are more than

27

sufficient to satisfy the "value" requirement. *See* U.C.C. § 1-204 ("[A] person gives value for rights if the person acquires them . . . (4) in return for any consideration sufficient to support a simple contract."). And not only did J. Aron's and BP's promises to pay satisfy the value requirement, the purchases gave SemGroup a new, valuable asset—accounts receivable, or simply "accounts" for U.C.C. purposes. *See* U.C.C. § 9-102(a)(2) ("'Account' . . . means a right to payment of a monetary obligation . . . (i) for property that has been or is to be sold . . . ."). SemGroup's accounts receivable were in turn used as collateral to secure its obligations to J. Aron and BP under the options trades.

To illustrate, when J. Aron and BP purchased oil on credit, SemGroup received IOUs from them. These IOUs became SemGroup's accounts. In turn, J. Aron and BP contracted for a setoff right between SemGroup's accounts and any amount SemGroup might owe J. Aron or BP for the options trades. In the event SemGroup ended up owing them money on the options trades, J. Aron and BP would get their IOUs (the accounts) back.

Hence these IOUs served as collateral for the options trades, not the oil.[6] J. Aron and BP received oil simply

---

[6] The accounts receivable created by the oil purchases were valuable to SemGroup, reducing its trading costs and increasing its liquidity. For example, as part of its option trades with J. Aron, SemGroup had to post cash collateral to meet margin requirements based on its exposure to that entity. This relieved SemGroup from posting the required cash margin based on the amount J. Aron owed SemGroup for oil purchases. To illustrate, if SemGroup had to post a $50,000 cash margin, it could substitute that amount with the accounts receivable (meaning J. Aron's IOUs) worth $50,000. As a

because they purchased it. Thus, because J. Aron and BP purchased oil from SemGroup and did not acquire it as secured parties, they meet this requirement of the buyer-for-value defense. *See* U.C.C. § 9-317(b) ("A buyer, other than a secured party, of . . . goods . . . .").

### 3. J. Aron and BP did not have knowledge of the Producers' security interests.

Whether J. Aron and BP bought the oil "without knowledge of the security interest" is the only remaining disputed requirement. We agree with the District Court that no reasonable factfinder could conclude that they had

---

result of this arrangement, SemGroup could put its cash to other uses.

The accounts receivable also were valuable for the Producers and others that dealt with SemGroup. The Producers' security interests could have extended to SemGroup's accounts receivable created by J. Aron and BP's purchases. *See* U.C.C. § 9-315(a)(2) ("a security interest attaches to any identifiable proceeds of collateral"); U.C.C. § 9-102(a)(64) (defining "proceeds" to include "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral. . . ."). But the Producers do not assert their security interests in SemGroup's accounts receivable, likely because their interests could have been subordinated to J. Aron and BP's setoff rights. *See* U.C.C. § 9-404; *see also* 504 B.R. at 52. The Producers could have contracted with SemGroup to ensure that these accounts would not be used as collateral for SemGroup's options trading business, but they did not.

29

knowledge of the Producers' security interests in oil. Despite volumes of discovery, at most the Producers have produced indications of constructive knowledge (a reason to know), but U.C.C. § 1-202(b) requires "actual knowledge."

SemGroup sold oil to J. Aron and BP per the industry standard Conoco General Provisions, which expressly disclaim the existence of any continuing security interest: "The Seller warrants good title to all crude oil delivered hereunder and warrants that such crude oil shall be free from all royalties, liens, encumbrances and all applicable foreign, federal, state and local taxes." J.A. 2505. Some 15 Producers even used this Conoco warranty language in their sales to SemGroup, although those Producers now argue that it applied only to third-party liens, not the ones created between a Producer and the purchaser.

It is also undisputed that the Producers never communicated with J. Aron and BP about any subject, let alone a security interest. Indeed, the Producers never took any steps to notify anyone about their purported security interest. And despite massive document discovery and numerous depositions, there is no evidence that anyone at J. Aron or BP—or anyone else for that matter—knew about the claimed security interests.

Nonetheless, the Producers contend that we can reasonably infer *actual* knowledge because of testimony that J. Aron or BP (1) were aware of state lien laws, (2) knew of the existence of some of the Producers, (3) knew that SemGroup purchased the oil on credit from the Producers, and (4) were aware that SemGroup's credit agreements with its lending banks carved out from the lending base those assets encumbered by "statutory Liens, if any, created under the laws of [various states]." J.A. 9488-89. This circumstantial evidence in no way shows that when

30

SemGroup resold the oil and expressly warranted that it was not encumbered by security interests, J. Aron and BP actually knew the truth was otherwise. At most, this establishes constructive knowledge—that J. Aron and BP might have a reason to believe that some oil was encumbered by a security interest at some time. But constructive knowledge does not defeat the buyer-for-value defense; only "actual knowledge" does. U.C.C. § 1-202(b).

Thus J. Aron and BP did not have actual knowledge of any security interest in the oil they purchased and meet all other requirements of the buyer-for-value defense. Accordingly, they took the oil free of the Producers' liens to the extent they even existed.[7]

---

[7] In light of this ruling, we need not reach the District and Bankruptcy Court's determination in the alternative that J. Aron and BP took the oil free of the security interests as buyers in the ordinary course. *See* U.C.C. § 9-320(a) ("[A] buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."); *see also* U.C.C. § 1-201(b)(9) (the seller must be "in the business of selling goods of that kind"). BP purchased oil from SemCrude, and it is undisputed that SemCrude was in the business of buying and selling oil and that it created the security interests when it purchased the oil from the Producers on credit. After the Bankruptcy Court recommended summary judgment, however, the Producers belatedly argued that J. Aron cannot avail itself of this defense because it purchased oil from SemCrude's parent, SemGroup. Because the Bankruptcy and District Courts did not have the full opportunity to reach this issue, it is not clear

## B.    The Fraud Claims

The Producers' fraud claims also fail.  They do not bring claims for fraudulent transfers under the Bankruptcy Code.  *See* 11 U.S.C. § 548.   Rather, they bring a common law fraud claim, contending that SemGroup did not intend to pay for the Producers' oil, and J. Aron and BP participated in this scheme to defraud.

The Producers first argue that the District Court erred procedurally by granting summary judgment *sua sponte* on fraud because J. Aron and BP moved for summary judgment only as to the causation element of fraud.  Even if this were a "*sua sponte*" grant, the Producers knew they needed to show that their fraud claims should survive summary judgment and the District Court did not abuse its discretion.

District courts "possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).   "Notice" simply requires that "the targeted party ha[ve] reason to believe the court might reach the issue and receive[] a fair opportunity to put its best foot forward.'" *Couden v. Duffy*, 446 F.3d 483, 500 (3d Cir. 2006) (citations omitted).   Even if the "notice" requirement is not met, the grant of summary judgment is only reversible if there is prejudice.  *See id.* at 507.

---

to us whether SemGroup (the parent) was in the business of selling oil or whether it was involved in creating the security interests.  Accordingly, out of an abundance of caution, we do not reach this issue.

Here, the Producers had the full opportunity to oppose summary judgment. The Bankruptcy Court, at the Producers' request, continued J. Aron and BP's initial motions for summary judgment and gave the Producers *an additional year* of discovery. Because there is no direct evidence of fraud, the Producers base their entire fraud claim on SemGroup's business structure and its transactions with J. Aron and BP. Yet all of this was the subject of discovery. The Producers addressed the fraud claims in oral argument before the Bankruptcy Court, and they have conducted numerous depositions and compiled documentary evidence that they now rely on in their effort to show fraud.

Moreover, even if we were to conclude there was insufficient notice or opportunity to develop the record, the Producers still have not shown prejudice. They argue that they would have introduced expert affidavits "had they been given proper notice that J. Aron/BP were moving for summary judgment on all elements of all fraud claims." Associated Producers Br. 51. These experts merely ask us to infer fraud because J. Aron and BP knew SemGroup's trading strategy was risky yet continued to trade options. But these reports would not have defeated summary judgment.

J. Aron and BP never communicated with the Producers, so naturally they did not make any false statements to them. As noted already, J. Aron and BP did not even know the identities of the thousands of producers that sold SemGroup the oil. SemGroup, until the bankruptcy filing, always paid the Producers in full for the oil, and J. Aron and BP also always paid in full for the oil they purchased.

Despite the lack of evidence that anyone did not intend to pay for the oil, the Producers contend that SemGroup purchased the oil without intending to pay for it and J. Aron

33

and BP aided and abetted this fraudulent scheme. But we fail to find one item of evidence indicating that SemGroup ever intended to avoid paying for oil.

The Producers never identify a time at which SemGroup started buying oil without an intent to pay or with a reckless disregard for its ability to do so. The only evidence of SemGroup's fraud comes from the Bankruptcy Examiner's report, but it has nothing to do with SemGroup's oil purchases. Instead, it addresses certain SemGroup executives' misconduct, which formed the basis of a shareholder lawsuit. *See In re SemCrude L.P.*, 796 F.3d 310 (3d Cir. 2015). And, if anything, the findings of the Examiner cut against fraud, as he concluded that SemGroup became insolvent because it kept losing on its options trades and that "[l]ast minute attempts by it to increase its credit facility failed." J.A. 869. If SemGroup had successfully increased its credit facility and avoided bankruptcy, all evidence suggests that it would have paid the Producers.

Even if we were to assume, for the sake of argument, that this evidence demonstrated that SemGroup defrauded the Producers, the evidence that J. Aron and BP conspired with SemGroup or aided and abetted this fraudulent scheme is still nonexistent. A civil conspiracy requires a shared intent to commit fraud—a "meeting of the minds." *See State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991); *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 701 (Tex. App. 2006); *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997), *as corrected* (Apr. 3, 1998). Aiding and abetting requires, in addition to substantial assistance or participation, knowledge of the fraud. *See Mays*, 811 P.2d at 1232; *Cotten*, 187 S.W.3d at 701; *Cooper v. Bondoni*, 841 P.2d 608, 612 (Okla. Civ. App. 1992).

There simply is no evidence that either J. Aron or BP knew it was taking oil that had not been paid for. Their mere knowledge that SemGroup purchased oil on credit, as was industry custom, does not suggest that they knew that any unidentified producers were still owed money or that SemGroup did not intend to pay for the oil when payment was due. Again, J. Aron and BP were purchasing oil at large aggregation centers where oil mixed with the same commodity from myriad other producers in various states. J. Aron and BP did not know that any of the millions of barrels of oil they purchased—to the extent it actually was the Producers' oil (a point J. Aron and BP vigorously dispute)—had not been paid for on the agreed payment date or that SemGroup did not intend to pay for it. At most the purchases-on-credit arrangement that is industry custom allows for a reasonable inference that, when J. Aron and BP transacted with SemGroup, they may have known that SemGroup might still have owed the Producers. However, no evidence leads to a reasonable inference that J. Aron and BP knew SemGroup intended to avoid paying for this oil or was reckless with its ability to pay for the oil.

The Producers also attempt to infer fraud from the options trades. They contend that J. Aron and BP knew that SemGroup's trading was speculative and not legitimate hedging, and thus, "[d]espite numerous concerns and red flags, no one from J. Aron or BP took reasonable steps to verify that this was a legitimate trading or hedging strategy," all the while continuing to do business with SemGroup. Associated Producers Br. 56. This lawful activity simply does not permit an inference of fraud.

J. Aron and BP paid millions in premiums up front for options to secure a price for oil, protecting themselves against an oil-price increase. SemGroup bet the opposite—that oil prices would drop. The prices kept rising, so SemGroup lost.

While this was a risky strategy that did not pay off, and in hindsight hedging might have served SemGroup better, this business arrangement does not demonstrate that J. Aron and BP intended to take the oil away from the Producers without payment.

## C. The Oklahoma Production Revenue Standards Act Claims

The Oklahoma Producers separately argue that the Oklahoma Production Revenue Standards Act (the "PRSA"), Okla. Stat. tit. 52, §§ 570.1 *et seq.*, creates an implied trust in their favor that, absent full payment, travels perpetually down the stream of commerce; in other words, so long as those Producers have not been paid, whoever possesses the oil does so for their benefit.[8] In addition, the argument goes, so long as an Oklahoma Producer has not been paid, whoever owns the proceeds of the oil needs to account for those proceeds to that Producer. Thus, even though downstream purchasers (like J. Aron) generally do not know the oil producers who sold the oil to the midstream purchasers, they allegedly have legal obligations to each Oklahoma Producer. Based on these trust duties, that Producer may bring claims against J. Aron for conversion, unjust enrichment, constructive fraud, and declaratory relief.

Fortunately for J. Aron and anyone who has unwittingly filled a gas tank with Oklahoma-produced oil,

---

[8] There is a sound argument that the Oklahoma Producers waived their PRSA trust arguments by expressly disclaiming them in the District Court. Nevertheless, in light of the importance of the legal questions at stake, we exercise our discretion to consider the issue despite the waiver. *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 139 n.8 (3d Cir. 2017).

this interpretation simply fails the text of the statute. First, whatever duties the PRSA creates, they do not apply to downstream purchasers like J. Aron. The PRSA regulates the relationships of the many parties at the wellhead, which include the various interest owners and the operators of those wells. Those interests are highly fractionalized and multiple persons may have a right to revenue from any well. *See* Okla. Stat. tit. 52, § 570.2 (defining an "owner['s]" interest, "proportionate production interest," "royalty interest," and "subsequently created interest"). The Oklahoma Producers themselves might owe many obligations to the various interest owners of their production. As there are numerous parties involved at the wellhead, the PRSA regulates all manner of these parties' relationship, for example, dictating specific procedures for how proceeds of production are shared among interest owners and operators, *id.* § 570.4, the process for "[d]esignation of person[s] for certain royalt[ies], accounting and remittance functions," *id.* § 570.5, detailed reporting requirements for all those involved at the wellhead, *id.* 570.8, and the "[i]nformation to be included with payments to [the] interest owner," including how many decimals revenue should be calculated and the measurements to describe gas volume. *Id.* § 570.12.

The PRSA, however, has no provisions relating to downstream purchasers. Those purchasers could be located out of state, and, as in the case of J. Aron, could be so far removed from the wellhead they do not even know the identities of the producers or the interest owners those producers represent. *See* Okla. Stat. tit. 52, § 570.2(1) ("'Owner' means a person or governmental entity with a legal interest in the mineral acreage under a well which entitles that person or entity to oil or gas production or the proceeds or revenues therefrom."). The statute simply does not govern the relationship of persons who later, down the line of commerce, repurchase this oil.

37

Second, while the PRSA contains some language suggesting a trust-like relationship, there is no language stating that it creates an implied trust that travels perpetually down the stream of commerce. PRSA § 570.10(a) states:

> All proceeds from the sale of production shall be regarded as separate and distinct from all other funds of any person receiving or holding the same until such time as such proceeds are paid to the owners legally entitled thereto. Any person holding revenue or proceeds from the sale of production shall hold such revenue or proceeds for the benefit of the owners legally entitled thereto. Nothing in this subsection shall create an express trust.

Okla. Stat. tit. 52, § 570.10(a).

The Oklahoma Producers rely on a 2008 Oklahoma Attorney General Opinion that concluded the language "owners legally entitled" to proceeds of the oil actually meant "implied beneficiaries," and therefore "[t]he holder of the revenue or proceeds of oil and gas production acquires no right, title or interest in such revenue or proceeds." 2008 OK AG 31 ¶ 22 (citations omitted). The Bankruptcy Court rejected the Attorney General's interpretation, and so have an Oklahoma intermediate appellate court and District Courts in Oklahoma. *See In re SemCrude, L.P., et al.*, 407 B.R. 140, 155 (Bankr. D. Del. 2009); *Gaskins v. Texon, LP*, 321 P.3d 985, 989 (Okla. Civ. App. 2014); *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 7267853, at *1 (W.D. Okla. June 23, 2011); *McKnight v. Linn Operating, Inc.*, No. CIV-10-30-R, 2010 WL 9039794, at *3 (W.D. Okla. Apr. 1, 2010). We agree.

38

Although the PRSA's language—that sale proceeds "shall be regarded as separate and distinct" and shall be held for the benefit of the owners "legally entitled thereto"—echoes trust language, these words cannot be stretched to create automatically an implied trust. First, it is a conceptual leap to take the language "paid to the owners legally entitled thereto" to mean that interest owners and producers automatically possess the "legal entitlement" of ownership of a beneficial interest in the proceeds, and that whoever actually holds the proceeds has no title to them. As the Bankruptcy Court noted, in the few instances where Oklahoma statutes have been construed to create an implied trust, those statutes imposed many more trust duties. *See* 407 B.R. at 152 ("[Those other statutes] demonstrated the requisite clear intent to form a trust because the State of Oklahoma (or an organ thereof) is the trustee, holding identified funds, for the benefit of identified beneficiaries. In sharp contrast, the PRSA does not identify a specific trustee, actually require segregation of a trust res or otherwise impose rights and duties typically associated with a trustee/beneficiary relationship.").

Second, a more faithful interpretation of the PRSA is that it provides for the imposition of a trust only in limited ways. As the concluding sentence of PRSA § 570.10(a) states, "Nothing in this subsection shall create an express trust." In contrast to an express trust, implied trusts arise in Oklahoma where it would be inequitable for one party to keep title to property. There are two types of implied trusts—resulting or constructive. A resulting trust may be judicially imposed "where the circumstances indicate that the grantor of legal title to property did not intend for the beneficial interest to be enjoyed by the grantee of the legal title." *Gaskins*, 321 P.3d at 989 n.5 (citation omitted). A constructive trust may be imposed "when an individual obtains a legal right to property through fraudulent, abusive means, or through a

39

method which violates equity and good conscience." *Id.* (citation omitted). In either case, equity or good conscience could require imposing trustee burdens on a party who violated a duty owed to another under the PRSA. However, the Oklahoma Producers do not argue that equity demands imposition of a trust, but only rely on the Attorney General's interpretation that the PRSA automatically implies a trust.

Finally, the Oklahoma Producers argue that the legislature "restated" that the PRSA created trust rights when it passed the 2010 Oklahoma Lien Act. This new Act created automatic oil liens in favor of producers that are outside the scope of the U.C.C. *See* Sahar Jooshani, *There's A New Act in Town: How the Oklahoma Oil and Gas Owners' Lien Act of 2010 Strengthens the Position of Oklahoma Interest Owners*, 65 Okla. L. Rev. 133 (2012); Alvin C. Harrell and Frederick H. Miller, *Aftermath of the SemGroup Case: Oklahoma Enacts the Oil and Gas Owners' Lien Act of 2010,* 81 Okla. Bar Assoc. J. 2818 (2010).

The 2010 Lien Act does not apply to our appeal because it post-dated SemGroup's bankruptcy. Yet the Oklahoma Producers point to it as evidence that the Oklahoma Legislature believed the PRSA created automatically an implied trust. The Lien Act includes buyer defenses for the liens it creates, which also apply to PRSA § 570.10(a): if the downstream purchasers were buyers in the ordinary course or had paid all consideration due, they take free of "any obligations created by [the PRSA]." Okla. Stat. tit. 52, § 549.6. The logic is that if the Oklahoma Legislature did not believe that the PRSA creates trust rights, the 2010 Lien Act would not have included buyer defenses to the PRSA. However, our take is that to the extent an implied trust *could* be imposed under PRSA § 570.10(a), all the Oklahoma Legislature made clear was that downstream purchasers could avail themselves of buyer defenses.

40

In summary, the PRSA did not create an implied trust here and did not impose any duties on J. Aron. As all the Oklahoma Producers' theories of relief were predicated on this construal of the Act, the District Court correctly entered summary judgment against the Oklahoma Producers.

*       *       *       *       *

Texas, Kansas, and Oklahoma all include statutes that provide some protections for those who produce oil in their States, but those protections do not reach downstream parties like J. Aron and BP. The Producers theoretically could have perfected their security interests, traced those interests in the oil that extended to their accounts receivable, and forbade SemGroup from using those accounts as margin collateral for their options trades.

But why didn't the Producers take such precautions? They contend they are a loose collection of relatively unsophisticated parties. However, these parties pool their interests and choose operators to extract and sell their oil; it does not seem farfetched that they could also choose a representative to file financing statements to perfect security interests or take other measures to protect against an oil purchaser's insolvency. The more likely explanation is that no midstream or downstream oil purchaser would buy oil from the Producers if they sought to encumber that oil as it flowed through interstate commerce and changed hands.

The oil industry operates through sales on credit. It involves thousands of producers and those producers represent countless interest owners who have fractionalized interests at the well. Downstream purchasers have no contact with these producers and do not even know who they are. This oil is pooled with myriad other producers' oil and is resold many times before consumers get it at the retail pump.

41

The industry thus uses the Conoco warranty that this oil is sold free and clear of any liens because it is a hard-to-trace, liquid asset that flows throughout the country.

In sum, if any producer of oil tries to sell it subject to a security interest or implied trust that flows endlessly down the stream of commerce, it will be unsold. The Producers' contention that a lien or trust follows oil from their wells to the gas pump does not make sense for this type of market. The effect of any opinion from us upholding the Producers' positions would be chaos. We thus affirm the superbly reasoned rulings of both the Bankruptcy and District Courts.