# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-50646

United States Court of Appeals
Fifth Circuit

**FILED**
February 3, 2021

Lyle W. Cayce
Clerk

In the Matter of: FIRST RIVER ENERGY, L.L.C.

Debtor

DEUTSCHE BANK TRUST COMPANY AMERICAS, Agent;
FIRST RIVER ENERGY, L.L.C.,

Appellees - Cross-Appellants

v.

U.S. ENERGY DEVELOPMENT CORPORATION;
AGERON ENERGY, L.L.C.; PETROEDGE ENERGY IV, L.L.C.;
TEAL NATURAL RESOURCES, L.L.C.;
CRIMSON ENERGY PARTNERS IV, L.L.C.; VICEROY PETROLEUM, L.P.;
RLU OPERATING, L.L.C.; DEWBRE PETROLEUM CORPORATION;
JERRY C. DEWBRE; AMERICAN SHORELINE, INCORPORATED;
TEXPATA PIPELINE COMPANY; AURORA RESOURCES CORPORATION;
AWP OPERATING COMPANY; TEXRON OPERATING L.L.C.;
MAGNUM PRODUCING, L.P.; MAGNUM ENGINEERING COMPANY;
MAGNUM OPERATING, L.L.C.; ROCK RESOURCES INCORPORATED;
KILLAM OIL COMPANY, LIMITED; ENERGY RESERVES GROUP, L.L.C.,

Appellants Cross-Appellees

Appeal from the United States Bankruptcy Court
for the Western District of Texas
USDC No. 5:19-CV-301

Before JOLLY, JONES, and ENGELHARDT, Circuit Judges.

EDITH H. JONES, Circuit Judge:

No. 19-50646

Appellants, comprising a number of Texas and Oklahoma oil and gas producers, challenge the bankruptcy court's grant, in part, and denial, in part, of Deutsche Bank's motion for partial summary judgment in this lien priority dispute. The allegedly competing security interests arose in proceeds from the sale of oil that the debtor, First River Energy, LLC purchased from Appellants before declaring bankruptcy. This court earlier granted an interlocutory appeal from the bankruptcy court's decision. 28 U.S.C. § 158(d).

The bankruptcy court adroitly untangled a thorny conflicts of law issue, the result of which, unfortunately, undermines the efficacy of a non-standard UCC provision intended to protect Texas oil and gas producers. TEX. BUS. & COM. CODE [hereinafter Texas UCC] § 9.343. As a result, producers must beware "the amazing disappearing security interest" and continue to file financing statements.[1] The Texas legislature should take note. As the court also correctly disposed of a host of other issues, we AFFIRM the bankruptcy court's order.

## BACKGROUND

First River Energy, LLC ("Debtor" or "FRE") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Delaware bankruptcy court in January 2018. In the month before filing, FRE had purchased crude oil and condensate from Texas and Oklahoma producers ("Producers"), which it sold to downstream purchasers, but FRE did not pay the Producers. The Producers assert liens created by statute in Texas and Oklahoma on the production and proceeds. However, Deutsche Bank Trust Company Americas, as Agent for various secured lenders (collectively "Bank"), also asserts the Bank's priority claim to the sale proceeds as a secured creditor

---

[1] David F. Asmus, *Top Ten Surprise Texas Oil and Gas Law Cases*, Seventieth Ann. Inst. on Oil and Gas Law 379-80 (2019).

No. 19-50646

of the Debtor.  The Debtor, an intervenor in this adversary proceeding, agrees with the Bank.

The mechanics of fossil fuel production frame the parties' debate.  After oil and gas is extracted upstream by producers, the production is sold to "first purchasers"[2] at or near the wellhead.  The first purchasers, also called midstream service providers, typically transport the production and market it to downstream purchasers like refineries or commodities traders.

Debtor FRE is a midstream service provider organized under Delaware law but headquartered in San Antonio, Texas.  Pre-petition, the Debtor, as the first purchaser,[3] bought oil under contracts with numerous upstream Producers located in Texas and Oklahoma and resold it to downstream purchasers.  According to their agreements and standard oil and gas industry practice, the Debtor's payments for Producers' deliveries that occurred in one month would be made "on or before the 20th of the month following delivery." *See In re Semcrude, L.P.*, 407 B.R. 112, 121 (Bankr. D. Del. 2009) (noting this industry practice).  The downstream purchasers paid Debtor according to the terms of their respective agreements.  As of the petition date, Debtor held $27,613,066.81 in accounts receivable from the downstream purchasers.[4]

RADCO Operations, LP ("RADCO") and RHEACO, Ltd. ("RHEACO") (collectively referred to as "RADCO Intervenors") also produced and sold Texas

---

[2] "'First purchaser' means the first person that purchases oil or gas production from an operator or interest owner after the production is severed, or an operator that receives production proceeds from a third-party purchaser who acts in good faith under a division order or other agreement authenticated by the operator under which the operator collects proceeds of production on behalf of other interest owners." Texas UCC § 9.343(r)(3).

[3] FRE took possession of the oil "[a]s product passes through SELLER's exit flange from lease tankage into BUYER's designated carrier trucks."

[4] The bankruptcy court found that by June 2018, Debtor had collected all outstanding accounts receivable from the downstream purchasers.

3

No. 19-50646

oil to First River pre-petition pursuant to a non-standard Crude Oil Purchase Agreement. They intervened in this adversary proceeding to collect payments for oil sold through December 2017, for which payment would have been due by the twenty-third of the following month (January). As explained below, the RADCO Intervenors are partially aligned with the Producers here.[5]

The Producers' sales to the Debtor are governed by identical agreements, each of which incorporated certain terms and conditions known as the Conoco Phillips General Provisions.[6] Among those terms is a warranty of title:

> **Warranty:** The Seller warrants good title to all crude oil delivered hereunder and warrants that such crude oil shall be free from all royalties, liens, encumbrances and all applicable foreign, state and local taxes.

The RADCO Intervenors' Purchase Agreements contain similar language.[7] The following discussion assumes RADCO's arguments are the same as those of the Producers except where specifically noted.

---

[5] The RADCO Intervenors did not appeal the bankruptcy court's summary judgment ruling. However, the Bank's cross-appeal and the Debtor's intervention in this appeal dispute certain of the bankruptcy court's conclusions about the RADCO Intervenors. Although RADCO does not appear as a party to this appeal, the disposition of Producers' rights will also determine the RADCO Intervenors' rights as a matter of law.

[6] The Debtor's standard form Producer Contract contains the following language:

Special Provisions: Conoco Phillips General Provisions dated 1993 and subsequent amendment dated 2009 are made a part of this contract by reference hereto. However, the terms herein shall control if there is any conflict between these terms and those in the General Provisions.

[7] The RADCO Purchase Agreement provides:

Warranty of Title and Authority to Sell. Seller [RADCO] hereby warrants and guarantees that the title to the portion of the crude oil sold and delivered hereunder which is owned by Seller is free and clear of all liens and encumbrances and warrants that as to the remaining portion of the crude oil sold and delivered hereunder Seller has the right and authority to sell and deliver said crude oil for the benefit of the true owners thereof.

No. 19-50646

Following a sweep of its deposit accounts by the Bank, the Debtor discontinued business at the end of December 2017. It had taken delivery from the Producers for that month but the purchase invoices were outstanding and unpaid. The Debtor sought Chapter 11 relief a few weeks later. The Producers filed proofs of claim in bankruptcy asserting that they have statutorily created first-priority, perfected purchase money security interests in the proceeds of the oil and condensate pursuant either to Texas UCC § 9.343 or Okla. Stat. Ann. tit. 52, [hereinafter Oklahoma Lien Act] § 549.[8]

The Bank's competing security interests stem from a credit agreement executed under Delaware law in July 2015 between FRE as borrower and the Bank. The Debtor simultaneously entered into a guarantee agreement and a security agreement with the Bank that granted a continuing security interest in substantially all of Debtor's assets, including its accounts and proceeds thereof. The security interest was perfected by filing UCC-1 financing statements with the Delaware Department of State in July 2015, and the filings have been updated to maintain continuous perfection. Debtor's indebtedness to the Bank and the validity and perfection of the Bank's security interests are not disputed.

As further protection for the Bank credit agreement, the Debtor, JPMorgan Chase, and the Bank entered into a Blocked Account Control Agreement in which the Bank was granted a security interest in all of Debtor's funds on deposit in accounts at JPMorgan Chase. The agreement indicates

---

[8] The Bank contends that the Producers never submitted adequate summary judgment proof of their secured claims. Timely filed proofs of claim, however, constitute prima facie evidence of creditors' claims. FED. R. BANKR. P. 3001(f). Claims are "deemed allowed," 11 U.S.C. § 502(a), unless properly objected to under the Bankruptcy Code. *See, e.g.,* 11 U.S.C. § 502(b). No objections were filed here. *See In re Heritage Highgate, Inc.,* 679 F.3d 132, 140 (3d Cir. 2012) (giving prima facie effect to the validity and amount of a properly filed secured claim).

that its terms "shall be governed by and construed in accordance with the law of the State of New York" because "the State of New York is the jurisdiction of [JPMorgan Chase] as [d]epositary for purposes of Section 9-304(b) of the Uniform Commercial Code."

First River, a Delaware entity, initially filed its chapter 11 petition in Delaware, but the bankruptcy court transferred the case to the Western District of Texas. 28 U.S.C. § 1412. The Bank initiated an adversary proceeding seeking a declaration of the first priority of its security interests in the accounts and cash proceeds from FRE's sale of the oil notwithstanding the Producers' claimed security interests. The Producers answered, counterclaimed, and asserted affirmative defenses; the Debtor intervened seeking a resolution of the conflict; and ultimately all sides briefed the Bank's summary judgment motion.

In March 2019, the bankruptcy court entered its Order Granting, in Part, and Denying, in Part, Agent's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment (the "Order") in the adversary proceeding. Critically, the bankruptcy court first decided that because Delaware does not have a UCC nonstandard provision comparable to Texas UCC § 9.343, a choice of law determination was required. The court's analysis led it to conclude that either Delaware or Texas, would "choose" the Delaware UCC to assess the validity, perfection and priority of the parties' liens. Notwithstanding Texas UCC § 9.343, the court held that the Bank's valid, perfected security interests in the Debtor's accounts and proceeds takes priority over unperfected or later-filed[9] secured claims of the Texas Producers. The court also concluded, however, that the Bank's interests are subordinate to the statutory real property liens asserted by the Oklahoma Producers. The

---

[9] Some Texas Producers filed financing statements in Delaware in early January 2018.

court affirmed the Bank's valid, perfected, first-priority security interest in Debtor's deposit accounts at JPMorgan Chase.

Responding to the Producers' request for interlocutory appeal of its decisions, the bankruptcy court certified the Producers' appeal for direct review by this court pursuant to 28 U.S.C. § 158(d)(2). We authorized the appeal and the Bank's cross-appeal.

## STANDARD OF REVIEW

A bankruptcy court's findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo. *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 (5th Cir. 2013). This court reviews "grants and denials of summary judgment *de novo*. Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *In re Crocker*, 941 F.3d 206, 210 (5th Cir. 2019), as revised (Oct. 22, 2019) (internal citations omitted). An order dismissing claims or defenses is also reviewed de novo. *Whitaker v. Collins*, 862 F.3d 490, 497 (5th Cir. 2017).

## DISCUSSION

The parties dispute bankruptcy court rulings that: (1) the Producers did not waive their claimed security interests through one of the Conoco Phillips General Provisions in the Producer Agreements; (2) the Delaware UCC is the body of law that governs the parties' priority dispute; (3) the Texas Producers' purchase money security interests under Texas UCC § 9.343 are subordinate to those of the Bank, while the Oklahoma Producers' statutory liens prime the Bank; and (4) the Producers' counterclaims and affirmative defenses were correctly dismissed. We address these issues in order.

## I.

Initially, the Bank argues that the Producers expressly waived any security interests in the proceeds of their production in the Conoco Phillips

General Provisions incorporated in the FRE sales agreements. The relevant provision, quoted fully above, states that "Seller warrants good title to all crude oil delivered . . . and that such crude oil shall be free from all . . . liens [and] encumbrances." As the bankruptcy court noted, the warranty's interpretation depends on contract law, not the court's perception of underlying policies.[10] Unambiguously, this provision is a "warranty," not a "waiver," and in fact a separate provision in the Agreements concerns waivers.[11] Texas law, applicable by the parties' designation, requires holistic construction of contractual provisions and "giv[ing] effect to all of the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). Whether considered against the background of Texas UCC § 9.343,[12] or by itself, this warranty covered the production alone, not the purchase price owed by the "first purchaser," which is the "proceeds" of sale. Accordingly, the bankruptcy court did not err in holding that the warranty of title did not waive the Producers' rights to assert a lien under either Texas UCC § 9.343 or the Oklahoma Lien Act. [13]

---

[10] *Cf. In re Semcrude L.P.,* 864 F.3d 280, 300 (3d Cir. 2017) (making an offhand comment that "[t]he industry thus uses the Conoco [Phillips] warranty that this oil is sold free and clear of any liens because it is a hard-to-trace, liquid asset that flows throughout the country").

[11] The "Waiver" section states: "no waiver by either party regarding the performance of the other party under any of the provisions of this Agreement shall be construed as a waiver of any subsequent performance under the same or any other provisions."

[12] Section 9.343(c) attaches the security interest to the production and proceeds from it, but while the security interest in the production is cut off by the first purchaser's sale to a buyer in the ordinary course, a security interest in proceeds remains intact "whether or not" such sale is to a buyer in the ordinary course. §§ 9.343(c),(e). The sales agreements with this Debtor were governed by Texas law. The Oklahoma Lien Act is comparable. Oklahoma Lien Act §549.6.

[13] The bankruptcy court found such reasoning equally applicable to the RADCO sales.

No. 19-50646

Because the warranties did not waive Producers' claims to proceeds in the hands of FRE, the Bank's reliance is misplaced on cases where producers attempted to collect from purchasers downstream of the first purchasers. In the Third Circuit's decision *In re Semcrude,* upstream producers sought to enforce their Texas and Oklahoma lien rights against purchasers downstream of the first purchaser. *In re Semcrude,* 864 F.3d 280 (3d Cir. 2017).[14] *See also J. Aron & Co., v. SemCrude, L.P.,* (*In re SemCrude, L.P.*), 504 B.R. 39, 60 (Bankr. D. Del. 2013) (bankruptcy decision resulting in above Third Circuit appeal; court states in dicta that the Conoco Phillips provisions constituted an "express warrant[y] that the product was not subject to any security interests"); *New Dominion, LLC v. J. Aron & Co. (In re SemCrude, L.P.),* 2018 WL 481862 at *4 (Bankr. D. Del. Jan. 17, 2018) (same). Here, in contrast, the Bank, a lender to FRE, competes with the Producers for proceeds in the hands of FRE as "first purchaser." In no case has a court held that the Conoco Phillips warranty provision prevents producers from asserting a lien against proceeds held by the first purchaser.

The Producers did not waive the right to assert their liens.

## II.

The pivotal merits issues involve special laws enacted in Texas and Oklahoma whose purpose was to facilitate and ensure payment to the states' oil and gas producers for sales of their production. *See* Texas UCC § 9.343; Oklahoma Lien Act § 549. But the Producers' path to success runs into a

---

[14] In the course of rejecting the producers' claims on various grounds, the court simply noted, without opining on, the fact that "Producers now argue that the [Conoco warranty language] applied only to third-party liens, not the ones created between a Producer and the purchaser." *Id.* at 295. Moreover, the court acknowledged testimony from the downstream entities that they were familiar with state lien laws and knew that the midstream/first purchaser's banks had carved out of their lending base assets encumbered by such "state liens." *Id.*

formidable choice of law hurdle in that Delaware, the state of Debtor's formal organization, does not recognize certain nonstandard UCC security interests. To review the bankruptcy court's determinations, it is necessary to describe the scope of the respective statutes, then to consider the choice of law, and finally to apply the substantive choice to the priority disputes here.

**A.**

1.   The Texas Producers rely on Texas UCC § 9.343, a nonuniform Uniform Commercial Code provision first enacted in 1983, which grants a first priority purchase money security interest in oil and gas produced in Texas as well as proceeds in the hands of any "first purchaser."[15]  A "first purchaser," is in pertinent part, "the first person that purchases oil or gas production from an operator or interest owner after the production is severed."  Texas UCC § 9.343(r)(3).

The statute's purpose is to "provide[] a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of . . . production, as debtor, to pay the purchase price."  Texas UCC § 9.343(b).  It effectuates a "security interest" that is "perfected automatically without the filing of a financing statement."  *Id*.  Automatic perfection occurs "if the interest of the secured party is evidenced by a deed, mineral deed, reservation in either, oil or gas lease, assignment or any other such record recorded in the real property records of a county clerk, that record is effective as a filed financing statement for the purposes of this chapter."  *Id*.  The security interest extends to the oil and gas production and the identifiable

---

[15] The Producers are included among the statutory "interest owners," defined as a "person owning an entire or fractional interest of any kind of nature in oil or gas production at the time of severance, or a person who has an express, implied, or constructive right to receive a monetary payment determined by the value of oil or gas production or by the amount of production."  Texas UCC § 9.343(r)(2).

proceeds of production owned by, received by, or due to the first purchaser. Texas UCC § 9.343(c)(1).[16] The security interest exists for an "unlimited time" in oil or gas production, accounts, or cash proceeds, and the periodic requirement to update any filing is dispensed with. Texas UCC § 9.343(c)(l)(A), (f). Moreover, "[a] security interest created by this section is treated as a purchase-money security interest for purposes of determining its relative priority under Section 9.324 over other security interests not provided for by this section." Texas UCC § 9.343(f)(1).[17]

Overall, the provisions of Section 9.343 so deviate from Texas's (and Delaware's) uniform Article 9 requirements for perfection, the effect of perfection, the length of perfection, and priority among security interests that they form a comprehensive scheme significantly benefitting statutory "interest owners." Tex. UCC § 9.343(r)(2).[18]

Critical to the Producers' interpretation of this non-uniform provision is Section 9.343(p), which provides that "[t]he rights of any person claiming a security interest or lien created by this section are governed by the other provisions of this chapter except to the extent that this section *necessarily displaces* those provisions." Texas UCC § 9.343(p) (emphasis added).

---

[16] One court has held that "tracing" proceeds is not required to render them "identifiable" under this provision. *In re Aurora Nat'l Gas, LLC,* 312 B.R. 318, 322 (Bankr. N.D. Tex. 1994).

[17] The statute disclaims granting a "statutory lien" except for taxes payable by the first purchaser or the rights of a person who would be entitled, but for the lack of a writing, to the protection of § 9.343(a). *See* Texas UCC § 9.343(d).

[18] An early expositor of the statute stated, "[w]hen interpreting the statute, it must be noted that added protection of the interest owner's position is frequently contrary to the policies underlying and traditional business practices based on Article 9 of the U.C.C." Cynthia Grinstead, *The Effect of Texas U.C.C. Section 9.319 on Oil and Gas Secured Transactions*, 63 Tex. L.Rev. 311 (1984).

No. 19-50646

2. The Oklahoma Lien Act creates a state statutory lien not connected with the UCC. "To secure the obligations of a first purchaser to pay the sales price, each interest owner is hereby granted an oil and gas lien to the extent of the interest owner's interest in oil and gas rights." Oklahoma Lien Act § 549.3. "Oil and gas rights" are broadly defined in the Oil and Gas Owner's Lien Act of 2010 as "any right, title or interest, whether legal or equitable" in and to oil, gas and proceeds. Further,

> b. By way of illustration and not limitation, oil and gas rights include, but are not limited to:
>
> (1) oil or gas in place prior to severance,
> (2) oil or gas production, or the right to receive a portion of the proceeds, upon severance,
> (3) any interest or estate in, by, through or under an oil and gas lease,
> (4) rights acquired under a pooling order insofar as such rights relate to: ownership of oil and gas, the right to proceeds, or the right to enter into an agreement to sell,
> (5) a legal or equitable right to receive consideration of whatsoever nature under an agreement to sell, or
> (6) a mortgage lien or security interest in any of the foregoing;

Oklahoma Lien Act § 549.2.

An oil and gas lien "exists in and attaches immediately to all oil and gas on the effective date of this act; continues uninterrupted and without lapse in all oil and gas upon severance; and continues uninterrupted and without lapse in and to all proceeds" until the interest owner has received the sales price. Oklahoma Lien Act § 549.3. Such liens are created and "perfected automatically without the need to file a financing statement or any other type of documentation." Oklahoma Lien Act § 549.4. Liens created under this statute "take[] priority over any other lien . . . or any security interest" "except for a permitted lien." Oklahoma Lien Act § 549.7. As noted in a comment to the statute, the created

12

interest takes "automatic super-priority without any public notice by filing or possession." Oklahoma Lien Act § 549.7 cmt. 1.

Critically, "the interest owner's oil and gas lien created by the Lien Act is not a UCC Article 9 security interest but rather arises as part of a real estate interest of the interest owner in the materials." Oklahoma Lien Act § 549.3 cmt. 2. Moreover, comment 2 clarifies that "the governing law . . . is the law of the state where the well is located . . . [to avoid] application of the UCC Article 9 choice of law rules for personal property." *Id.* (citations omitted).

3. Delaware follows the uniform UCC requirements, whereby perfection of a security interest in inventory, accounts, and proceeds is achieved by filing a financing statement. *See* Del. Code Ann. tit. 6, § 9-310(a) (filing required with exceptions not relevant here). A perfected security interest attaches only to "identifiable" proceeds of collateral in which the original collateral's security interest was perfected. Del. Code Ann. tit. 6, §§ 9-315(a)(2), (c). And Delaware follows the first-to-file-or-perfect rule. Del. Code Ann. tit. 6, § 9-322(a)(1). Delaware's UCC has no nonstandard provision comparable to Texas UCC § 9.343 or the Oklahoma Lien Act.

Further, as provided in the Uniform UCC, Delaware treats the priority of a security interest in deposit accounts as governed by the local law of the bank's jurisdiction, and state law allows the debtor and the bank holding the deposits by contract to specify the bank's jurisdiction for these purposes. Del. Code Ann. tit. 6, § 9-304(a), (b)(1). In this case, there is no disagreement that FRE and the Bank chose New York law as the law of the depositary bank's (JPMorgan Chase's) jurisdiction. Nor is it disputed that, through the Blocked Account Control Agreement, the Bank perfected its security interests by control of the deposit accounts. *See* N.Y.U.C.C. § 9-312(b)(1).

No. 19-50646

## B.

The bankruptcy court acknowledged that the differences between Texas and Oklahoma and Delaware law concerning the Producers' priority rights raised a serious potential conflict of law issue. The Bankruptcy Code, however, provides no method for resolving conflicts of law, and "[t]his circuit has not determined whether the [federal] independent judgment test or the forum state's choice-of-law rules should be applied in bankruptcy." *In re Mirant Corp.*, 675 F.3d 530, 536 (5th Cir. 2012) (citing *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981)).[19] We need not decide between the Texas forum's law or federal law where both bodies of law reach the same result. *Woods-Tucker*, 642 F.2d at 748.[20]

Texas courts, as it happens, apply the Restatement (Second) of Conflicts of Law (1972). *Fishback Nursery, Inc. v. PNC Bank, N.A.,* 920 F.3d 932, 939-

---

[19] There is a circuit split on which this court has not taken sides. *Fishback Nursery, Inc. v. PNC Bank, Nat'l Ass'n*, 920 F.3d 932, 935 (5th Cir. 2019). Some courts apply the choice of law of the bankruptcy forum on the basis of *Erie* principles, specifically *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 616 S. Ct 1020 (1941). Under that principle, because bankruptcy must allocate the debtor's assets according to state law, except to the extent superseded by federal law, the choice of law of the forum state prevails. *See, e.g., Robeson Indust. Corp. v. Hartford Accid. & Indem. Co.,* 178 F.3d 160, 164-65 (3d. Cir. 1999); *In re Gaston & Snow,* 243 F.3d 599, 605-07 (2d Cir. 2001); *In re Merritt Dredging Co.,* 839 F.2d 203, 206 (4th Cir. 1988).

Others derive the imperative to employ federal choice of law rules, and specifically the Restatement factors, from *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 67 S. Ct. 237 (1946), *see In re Lindsay,* 59 F.3d 942, 948 (9th Cir. 1995). *Vanston*'s adoption of a federal choice of law in that case was met with a dissent by Justice Frankfurter, who noted that underlying creditors' rights in bankruptcy nearly always derive from and therefore must be adjudicated according to state law. Frankfurter's views were powerfully echoed by the unanimous Supreme Court in *Butner v. United States,* 440 U.S. 48, 99 S. Ct. 914 (1979). Lower courts may not prematurely declare Supreme Court cases to be "overruled," however, it is very doubtful that *Vanston* survives either the enactment of the Bankruptcy Code or the import of *Butner.* In addition, *Vanston* did not apply a federal choice of law to an adversary proceeding arising wholly under state law.

[20] The Bank argues that the "forum" law should be that of Delaware, inasmuch as the FRE bankruptcy was filed in Delaware, then transferred to Texas. The Supreme Court holds that in diversity cases, the "forum" for choice of law as well as the substantive law is the state

No. 19-50646

40 (5th Cir. 2019); *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.,* 145 F.3d 337, 340 (Tex. App. 2004). The federal independent judgment test, relied on by the Producers, also uses the Restatement (Second) of Conflicts of Law. The Bank and the Producers differ in the order in which provisions of the Second Restatement are to be considered.

This court's decision in *Fishback Nursery* has resolved that dispute in favor of the Bank. *Fishback Nursey,* like this case, settled competing lien priorities in a bankruptcy concerning "farm products" by applying the "most significant relationship" standard from Section 6 of the Second Restatement.[21] *Fishback Nursery,* 920 F.3d at 939-40. The court found Section 6 "quite simple to apply where, as here, 'Texas . . . has a statute which specifically controls the choice of law issue.'" *Id.* at 938-39 (quoting *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan,* 883 F.2d 345, 353 (5th Cir. 1989)). That simple-to-apply statute was Texas UCC Section 9.302. *Fishback* went on to hold that this court had previously applied the Section 6 factors as a "touchstone" in the independent judgment test. *Id.* at 939.

We are bound by *Fishback Nursery's* interpretation of Texas and federal choice of law principles in this case, in which the simple-to-apply state conflict of laws statute is Texas UCC § 9.301. Here, Texas UCC § 9.301(1) governs the perfection, effect of perfection and priority of security interests by applying the

---

in which the case was originally filed. *Piper Aircraft v. Reyno,* 454 U.S. 235, 243 n.8, 102 S. Ct. 252, 259 (1981); *Van Dusen v. Barrack*, 376 U.S. 612, 84 S. Ct. 805 (1964). The Bank's position is arguable, but unlikely: the Bank *commenced* this declaratory judgment action, which is an adversary proceeding within the bankruptcy case, in Texas bankruptcy court following the transfer. The adversary proceeding was never itself transferred from Delaware. Texas is the forum.

[21] Section 6 comment (a) singles out the Uniform Commercial Code to support its statement that courts generally "must apply a local statutory provision directed to choice of law."

local law of the jurisdiction where "a debtor is located."[22]    Texas UCC Section 9.307(e) defines the debtor's "location" as the state of "organization" for a L.L.C. like FRE.    Therefore, following *Fishback Nursery,* Delaware law governs the competing priorities under either Texas choice of law or the federal independent judgment test.

The Producers counter the application of substantive Delaware law in several ways.    First, they contend that proper application of the federal independent judgment test would adhere to Section 251(1) of the Second Restatement, which addresses the "validity and effect of [a] security interest in chattel[s]."    Restatement (Second) of Conflict of Laws § 251(1).    According to that section's commentary, the "most significant relationship" standard would give "greater weight" to the location of the "chattels" at the time the security interest attached in order to secure predictability and certainty.    *Id.* at § 251(1) cmt. e.    But those concerns are prefaced by two significant features of the Section.    First, the Introductory Note before the Restatement Section on encumbrances notes that it generally defers to UCC choice of law provisions.[23] Restatement (Second) of Conflict of Laws ch 9, topic 3, title B (1971).    Second, the commentary accompanying Section 251 incorporates both Section 6 principles and the UCC.    Restatement (Second) of Conflict of Laws § 251.    Even apart from the conclusions of *Fishback Nursery,* we find little basis for elevating Section 251 above the relevant Texas UCC choice of law.

---

[22] Section 9.301(1) states: "Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." Texas U.C.C. § 9.301(1).

[23] The need for deference is magnified by the replacement of previous Article 9  choice of law provisions referenced in the Second Restatement with what is now UCC Sections 9.301 et seq., which provide more uniformity and clarity in choice of law for secured transactions.

But what is the *relevant* Texas UCC choice of law? The Producers turn to Section 9.343(p), contending that their rights as secured creditors are not governed by the law of FRE's formal organization, Delaware, because by its terms, Section 9.343 "necessarily displaces" the general Texas UCC choice of law rules. Texas UCC § 9.343(p). This argument is practically appealing. Enforcing Sections 9.301(1) and 9.307(e) eviscerates the intended scope of Section 9.343[24] and renders its protection useless when a debtor to the Producers is organized outside the state of Texas, as no doubt a majority are. On close examination, however, the argument fails.

Section 9.343 was deliberately enacted within the Texas UCC.[25] Texas UCC Article 9 extensively categorizes the types of transactions to which it applies or does not apply. *See generally* Texas UCC § 9.109. Interests created by Section 9.343 fall in the general category of "a transaction . . . that creates a security interest in personal property . . . by contract." *Id.* at § 9.109(a)(1). Agricultural liens, in contrast, are identified separately. *See Id.* at § 9.109(a)(2). Article 9 does not extend to liens created by "another statute of this state" that expressly governs the creation, perfection, priority or enforcement of certain state-created security interests. *Id.* at § 9.109(c)(2). Nor does Article 9 cover more than a dozen other types of transactions and enumerated liens, assigns and interest transfers. *Id.* at § 9.109(d). Because Section 9.343 interests are not created by "another statute of this state," they

---

[24] This provision, formerly codified as Texas UCC § 9.319, evinced a reaction to a wave of 1980s oil patch bankruptcies where producers and similar interest owners, frequently relegated to the status of general unsecured creditors, went uncompensated. *See Grinstead*, *supra* n.18 at 322-323, describing the history of § 9.319.

[25] The Producers cite cases deciding priority disputes between UCC interests and statutory liens, but Texas UCC § 9.343 does not (with one minor exception for taxes) create a statutory lien.

17

are thus included, not singled out, in this introductory provision describing the scope of coverage or exemption from Article 9 as a whole. *Id.* at § 9.109(c)(2).

When it comes to choice of law, Section 9.301 articulates the general Article 9 rules, *except as otherwise provided* in Sections 9.302-307. *Id.* at § 9.301. Those exceptions cover, respectively, agricultural liens, goods covered by a certificate of title, deposit accounts, investment property, and letter-of-credit rights. *Id.* Again, no exception is made for security interests created by Section 9.343 in produced oil and gas. *Id.*

Given the overall specificity with which Texas Article 9, following in most instances the UCC, includes, excludes, or articulates special choice of law rules for many other types of transactions, the absence of special treatment for Section 9.343 interests is just that—absence. In fact, two provisions of the Texas UCC specifically accommodate security interests created by Section 9.343.[26] The Texas legislature plainly understood the significance of specificity in regard to other types of security transactions and Section 9.343 interests. Conversely, in light of these other provisions, it is difficult to conclude that Section 9.343 "necessarily," though impliedly, "displaces" the general choice of law rules.[27]

Further, because deciding the choice of law that governs a dispute is a prelude to deciding the dispute, the Producers essentially put the cart before the horse by relying on the source of their substantive interests, Section 9.343,

---

[26] *See* Texas UCC § 9.310(b)(11) (§ 9.343 exception to filing financing statement); Texas UCC § 9.324(b)(2) (no authenticated notice necessary for § 9.343 lienholder to send to conflicting security interest holders).

[27] The Third Circuit's reading of § 9.343 concluded as much in stating that, "these local laws apply when the debtor is located in Texas . . ., or where the debtor is so closely involved at the well-head that it has some preexisting interest in the oil before it is extracted from the ground." *In re Semcrude,* 864 F.3d at 292.

to gauge the choice of law. We do not deny the force of the term "necessarily displaces" in Section 9.343(p), but the scope of Section 9.343 is declared in its title: "Oil and Gas Interests: Security Interest Perfected without Filing; Statutory Lien." The terms of perfection, continuation, and priority of such interests are covered, which suggests that any "necessary displacement" relates to other provisions of Article 9 concerned with perfection, continuation and priority, not to generic choice of law provisions.

Challenging this reading of the statutory provisions, one experienced commentator advocates that "the physical placement of the Section 9.343 in Article 9 as opposed to the Property Code ought not be outcome determinative" of choice of law. *See* Rhett G. Campbell, *A Survey of Texas Oil and Gas Bankruptcy Issues*, 5 Tex. Oil, Gas & Energy L. 265, 293 (2009).[28] This commentator describes Section 9.343 as a "hybrid statute," more akin to a mechanic's and materialmen's lien found in the Texas Property Code than the consensual security interests dealt with in the Texas UCC. *Id.* Such a status may very well characterize the goal of Section 9.343. But we are bound by the legislature's unambiguously expressed intent, not its uncodified intention. Consequently, a holistic reading of Texas UCC Article 9 does not support the Producers' proposition that § 9.343(p) necessarily displaces § 9.301-307.

Prompted by an inquiry from this court, the Producers argue that they may take advantage of one of the special Texas UCC choice of law provisions (mirroring the UCC) applicable to "as-extracted collateral." For such collateral, which includes oil and gas production and accounts arising from their sales, "[t]he local law of the jurisdiction in which the wellhead or minehead is located governs Article 9 security interests. Texas UCC § 9.301.

---

[28] The author challenged the first bankruptcy court ruling that decided choice of law issues under UCC Article 9 adversely to Texas producers asserting § 9.343 security interests. *See In re Semcrude,* 407 B.R. 112 (Bankr. D. Del. 2009).

No. 19-50646

To aid the Producers, this provision would have to mean that their production amounted to as-extracted collateral to which their Section 9.343 security interests attached. Texas UCC defines "as-extracted collateral" to mean oil, gas, or other minerals that are subject to a security interest that is created *by a debtor* having an interest in the minerals *before* extraction or accounts arising from such sales in which the debtor's interest predated extraction. Texas UCC § 9.102(6).

Focusing on the lack of a statutory definition of a debtor's "interest" in the minerals, the Producers admit that FRE did not obtain legal title until oil and condensate passed from their storage tanks into the FRE's trucks or pipeline. However, they assert that FRE's exclusive right to purchase production created an equitable interest or title in "as-extracted collateral," on which the Producers held a security interest. This argument would fundamentally recharacterize the parties' relationship and transform the sellers into a lender. This claim is insupportable. The Debtor's bankruptcy schedules do not list its ownership of mineral interests as property, and the Debtor's CEO testified that FRE purchased oil at the wellhead that generated accounts receivable to the Producers. Finally, the Producers' contracts with Debtor stipulate that delivery of the product and transfer of title from the Producer to Debtor occurred when the product is loaded on Debtor's carrier trucks.[29] *See also SemCrude,* 864 F.3d at 292 ("SemGroup had no interest in the oil while it was in the ground. Only after the Producers extracted and sold it did SemGroup become involved"). The Producers had no enforceable security

---

[29] The contracts state: "Delivery: As product passes through SELLER's [Producer's] exit flange from lease tankage into BUYER's [Debtor's] designated carrier trucks." The ConocoPhillips General Provisions similarly stipulate that title passes at the point of delivery, namely, as the oil exits the flange.

interest based on the as-extracted collateral provision. Section 9.301(4) is inapplicable.

The Producers next attempt to rely on a Texas choice of law provision in the Conoco Phillips General Provisions incorporated in the Producers' Sales Agreements with FRE. But the instant dispute is a lien priority contest with a third-party creditor, the Bank, not a suit between parties to the Sales Agreements. As this court explained in *Fishback Nursery*, enforcing the choice-of-law provision "would be unfair to parties who are strangers to the contract containing the choice-of-law provision, including third-party creditors in lien disputes like this one." *Fishback Nursery*, 920 F.3d at 938. Accordingly, the UCC limits the ability of parties to contract around which state's substantive law applies to the priority and perfection of security interests.[30] *Id*. at 938 n.6. The choice of law for the Producers' agreements with the Debtor cannot bind the Bank.

## C.

Concurring with the bankruptcy court that substantive Delaware UCC law governs these priority disputes, we must analyze the comparative rights of the Bank against the Texas and Oklahoma Producers. As explained previously, Delaware UCC law requires filing financing statements with its state authorities to perfect security interests in goods, inventory and proceeds and determines priority according to the first-to-file rule. The Bank's financing statements have been perfected and continuously updated since 2015.

---

[30] Parties taking a security interest must have a way to know whether and where to file security interests and where to look for existing filings. Because entities outside of contractual privity would have no way of knowing whether a contract changed the substantive law governing the priority and perfection of their liens, courts are hesitant to enforce choice-of-law provisions in that context. *See, e.g., In re Morse Tool, Inc.*, 108 B.R. 384, 386 (Bankr. D. Mass. 1989); *Matter of High-Line Aviation, Inc.*, 149 B.R. 730, 735 (Bankr. N.D. Ga. 1992); *In re Eagle Enterprises, Inc.*, 223 B.R. 290, 293 (Bankr. E.D. Pa. 1998).

Further, under the Delaware UCC, the Bank's possession of the Debtor's deposit accounts secures its interest in those blocked accounts.

1. The Texas Producers are out of luck under Delaware UCC law, which does not recognize the priority of their unfiled, unperfected security interests in proceeds under Texas UCC Section 9.343. The rights of those Producers who attempted to file financing statements in Delaware about the time that the Debtor defaulted are subordinate to the Bank's first-in-time filings.

The Producers assert that Official Comment 7 to the Delaware Code Section 9-320 recognizes the existence of nonuniform laws providing "special protections to mineral owners." Del. Code Ann. tit. 6, § 9-320 cmt. 7. So it does, and the Producers also correctly observe that this court regards Official Comments as instructive on the interpretation of UCC provisions. *Ford Motor Co., LLC v. Dale (In re Dale),* 582 F.3d 568, 574 (5th Cir. 2009). But the Official Comment goes on to suggest that in light of the complications that would ensue from conforming those provisions with the UCC,[31] "a uniform solution would not be feasible" and "this Article leaves its resolution to other legislation." Del. Code Ann. tit. 6, § 9-320 cmt. 7. This Comment plainly does not state that rights created by nonstandard UCC provisions are inviolate when controversies arise between a party claiming interests under those laws and another secured party.

The Producers also contend that the Bank's loan documents with FRE waive or subordinate the Bank's assertion of security interests in proceeds from FRE's sales of the Producers' oil and condensate. Specifically, the Bank's credit agreement with FRE provides that "100% of the First Purchaser Lien

---

[31] More specifically, this Comment is attached to a UCC provision that describes when the buyer in the ordinary course takes free of encumbrances. Del. Code Ann. tit. 6, § 9-320 (d).

Amount[s]" is excluded from the "Borrowing Base." The agreement defines "First Purchaser Lien[s]" according to the definition provided in Texas UCC § 9.343 and "comparable Laws of the states of Oklahoma, Kansas, Mississippi, Wyoming, New Mexico, or North Dakota, or any other comparable Law of any such jurisdiction or any other applicable jurisdiction." Moreover, such First Purchaser Liens are a permitted lien on the Debtor's property in § 8.3(h) of the credit agreement.

The bankruptcy court held that the permitted liens under § 8.3 of the credit agreement did not result in a waiver of priority by the Bank. The parties' security agreement stipulated that permitted liens could not "be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the transaction Documents to any Liens permitted under Section 8.3 of the Credit Agreement." Under Texas law, waiver is "the intentional relinquishment of a known right or intentional conduct that is inconsistent with asserting that right." *Teal Trading and Dev. LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558, 584 (Tex. App. 2017), aff'd, 593 S.W.3d 324 (Tex. 2020). Moreover, "Delaware courts have consistently held that the existence of an express non-waiver provision precludes a contracting party from arguing that the other party's conduct waived a contractual right." *AgroFresh Inc. v. MirTech, Inc.*, 257 F.Supp.3d 643, 660 (D. Del. 2017) (collecting cases).

Although the credit agreement acknowledges First Purchaser Liens, and it even limits the Debtor's borrowing base in accord with such liens, the security agreement expressly does not subordinate the Bank's security interest. Including First Purchaser Liens in the "permitted liens" under the agreement means that Debtor did not default under the credit agreement by allowing such liens. This arrangement is a practical necessity for a midstream service provider. The Bank waived no priority rights to the proceeds.

No. 19-50646

Having carefully reviewed all of the Producers' arguments, we must affirm the bankruptcy court's conclusion that the Bank's interests in the disputed collateral prime any interests held by the Texas Producers.

2.  The Oklahoma Producers contended successfully in the bankruptcy court that they are entitled to a first-priority statutory lien in the proceeds from Debtor's sale of the oil produced in Oklahoma.  Although Delaware law contains no statutory lien provision similar to the Oklahoma Lien Act, the Delaware UCC does not preempt statutory liens created by other states.

Passed in 2010, the Oklahoma Lien Act was meant to cure the defects found in the state's Lien Act of 1988 by the Delaware bankruptcy court in *In re SemCrude*.  407 B.R. 112 (Bankr. D. Del. 2009); Oklahoma Lien Act § 549.1 cmt. 10.  In that case, the court held that Oklahoma producers were subject, as Texas Producers still are, to UCC rules governing choice-of-law and priority and perfection of security interests.  *Id.* at 133.  The Oklahoma legislature acted promptly to provide greater protections for producers.

Commenting on the new statute, an Oklahoma appellate court explained that "the purpose of the statute was to give Oklahoma producers and royalty owners a first-priority lien to secure payment for their interest in oil and gas sold to a first purchaser." *Gaskins v. Texon, LP*, 321 P.3d 985, 990 (Okla. Civ. App. 2013).  The court further stated:

> [the Oklahoma Lien Act] strengthens the rights of Oklahoma interests owners in three (3) ways: (1) Oklahoma oil and gas interests are now governed by real property law, which designates the applicable law by the state in which the wellhead is located; (2) Oklahoma interest owners can now obtain a lien that will remain attached until a first purchaser has paid in full the purchase price of produced oil; and (3) the Lien Act explicitly and unbendingly grants superior priority to Oklahoma interest owners above all other lienholders and U.C.C. Article 9 secured creditors.

24

*Id.* at 991 (citing Sahar Jooshani, *There's A New Act in Town: How the Oklahoma Oil and Gas Owners' Lien Act of 2010 Strengthens the Position of Oklahoma Interest Owners*, 65 Okla. L. Rev. 133 (2012)).

The Bank does not challenge that the Oklahoma Lien Act creates a first-priority statutory lien outside the UCC, but contends instead that the Oklahoma Producers offered no summary judgment evidence demonstrating the extent of their interests. Evidence proffered by the Bank, however, through Debtor's CEO Kryak, acknowledged the Oklahoma Producers' claims and estimated the value of those liens at "less than $1 million." Proof to the penny was not required at this summary stage of the proceedings.

We perceive no reason to disturb the bankruptcy court's assessment of priority between the Oklahoma Producers and the Bank, nor its further conclusion that the Producers will be required to prove up the extent and amount of their secured claims.

## III.

The Producers asserted affirmative defenses described as estoppel, unclean hands, and waiver.[32] The bankruptcy court correctly dismissed these theories, all of which depend on incorrect assertions about the Bank's credit agreement and securitization documents. As we have discussed, the Bank's documentation of its loans to FRE did not waive or subordinate its security interests to those claimed by the Producers, nor is the Bank "estopped" to base its claim on documentation that merely identified the Producers' potential liens. The Producers admit that their "unclean hands" defense is plausible

---

[32] The Producers also filed counterclaims for conversion and declaratory judgment. We need not address the court's waiver ruling as the Producers abandoned that claim in the Reply brief to this court. The bankruptcy court's holding on lien priorities expressly rejected the Producers' counterclaim for declaratory judgment seeking recognition of their first priority status.

only if the Bank wrongly swept the Debtor's accounts in early January 2018 in derogation of their security interests. This defense is meritless in light of the preceding conclusions.

## IV.

Finally, the Bank contends that the bankruptcy court erred by holding that it would allow the Oklahoma producers to submit an application for attorney's fees for prevailing on their declaratory judgment counterclaim. The Bank contends under the Declaratory Judgment Act, attorney's fees are recoverable "only where they are recoverable under non-declaratory judgment circumstances." *See Mercantile Nat'l Bank at Dallas v. Bradford Trust Co.*, 850 F.2d 215, 216 (5th Cir. 1988). That is correct. And here, the Oklahoma Lien Act specifically authorizes recovery of attorney's fees by the prevailing party in a proceeding to enforce oil and gas liens. *See* Oklahoma Lien Act § 549.10. Persisting nonetheless, the Bank asserts waiver of the Producers' rights because they omitted to mention the provision in the bankruptcy court. We leave this procedural argument to the bankruptcy court after the Producers prove up their Oklahoma liens.[33]

## CONCLUSION

For the foregoing reasons, we AFFIRM the bankruptcy court's order granting, in part, and denying, in part, the Bank's motion for partial summary judgment, granting relief to the Oklahoma Producers, and dismissing the Producers' affirmative defenses.

---

[33] We DENY the Bank's request that this panel be assigned permanently to any further appeals arising from this adversary proceeding.